IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN WHITE,

        Plaintiff,

v.

SCOTT RACE, et al.,

        Defendants.

CIVIL ACTION
NO. 13-5969

**OPINION**

Slomsky, J.                                                                                                             April 17, 2014

### I.   INTRODUCTION

From 2007 to 2013, Plaintiff Brian White ("Plaintiff") worked as a financial planner for Simon Financial Group ("Simon Financial") pursuant to an employment contract (the "Employment Contract"). Scott Race ("Defendant Race") is the Chief Executive Officer of Simon Financial. Defendant Race is married to Joanne Race and is the son of Elaine and Stephan Race, all of whom are named as Defendants in this case.

On September 18, 2002, Plaintiff and Defendant Race executed a contract regarding certain individual clients who had purchased 401(k) plans from Simon Financial (the "September 18, 2002 Contract"). Under the September 18, 2002 Contract, Plaintiff agreed to pay $40,000 to Defendants in exchange for 95% of the profits generated by sixteen 401(k) and individual client accounts. In June 2013, after a dispute arose between Plaintiff and Defendant Race, Plaintiff was terminated from Simon Financial. On October 11, 2013, Plaintiff instituted this action against Defendants based on allegations that Defendant Race did not allow him to take the accounts he purchased.

1

Defendants filed an Answer and Counterclaim, in which they allege three counterclaims against Plaintiff. In Count I, they allege breach of contract; in Count II, they allege fraud; and in Count III, they allege conversion of intangible property. On December 23, 2013, Plaintiff filed a Motion to Dismiss the counterclaims for breach of contract and fraud. (Doc. No. 4.) This Motion is now ripe for disposition.[1] For reasons that follow, the Court will dismiss Defendants' counterclaim for fraud. Defendants' counterclaim for breach of contract will not be dismissed.

## II. BACKGROUND

In order to fully understand the nature of this case, it is necessary to set forth the factual allegations in both the Complaint and the Answer and Counterclaims. (Doc. Nos. 1, 4.) As noted, from July 2007 to June 2013, Plaintiff worked as a financial planner for Simon Financial. (Doc. No. 1 at ¶¶ 11, 14, 37.) During his term of employment, Scott Race was the Chief Executive Officer of Simon Financial. (Id. at ¶ 12.) Plaintiff and Defendant Race worked to expand the financial products offered by Simon Financial by offering 401(k) plans to clients. (Id. at ¶ 16.) As a result of these efforts, numerous individual clients purchased 401(k) plans from Simon Financial. (Id. at ¶ 17.) Each 401(k) account generated revenue based on a percentage of total assets. (Id. at ¶ 18.) Defendant Race agreed to split the profits equally with Plaintiff from these accounts. (Id. at ¶ 19.)

According to the Complaint, in the summer of 2012, Defendant Race told Plaintiff that he no longer wanted to work on the 401(k) accounts or be involved in the 401(k) business. (Id. at ¶ 21.) Defendant Race proposed that Plaintiff purchase part of Defendant Race's interest in certain 401(k) accounts. (Id. at ¶ 22-23.) Plaintiff agreed and executed the September 18, 2002

---

[1] In reviewing this Motion to Dismiss, the Court considered the Complaint (Doc. No. 1), the Answer and Counterclaims (Doc. No. 2), Plaintiff's Motion to Dismiss (Doc. No. 4), Defendants' Response (Doc. No. 7), Plaintiff's Reply (Doc. No. 8), and the supplemental briefs filed by both parties (Doc. Nos. 13, 14).

Contract, in which he agreed to pay Defendant Race $40,000 for 95% of the total future profits derived from the sixteen specified 401(k) and individual client accounts.[2] (See Doc. No. 7, Ex. A.) Defendant Race agreed to take 5% of the future profits from these accounts "in order to ensure that there was a liability buffer between Plaintiff White and both the individual clients and owners of the 401(k) accounts." (Doc. No. 1 at ¶ 23.) Defendant Race also promised to assist with transitioning the sixteen accounts to Plaintiff. (Id. at ¶ 25.) Plaintiff fulfilled his terms of the September 18, 2002 Contract by paying $15,000 to Defendant Race, $15,000 to Defendant Joanne Race, $5,000 to Defendant Elaine Race, and $5,000 to Defendant Stephen Race, for total payment of $40,000. (Id. at ¶¶ 30-33.)

On June 5, 2013, Defendant Race terminated Plaintiff from Simon Financial. (Id. at ¶¶ 37-38.) Shortly thereafter, Plaintiff co-founded the financial firm, Vermillion and White. (Id. at ¶ 39.) According to the Complaint, Defendant Race again assured Plaintiff that he would help transition the sixteen specified accounts to Plaintiff's new firm. (Id. at ¶ 42.) Plaintiff scheduled meetings with these clients to discuss the transition. (Id. at ¶ 43.) However, fourteen of the sixteen clients declined to transfer their accounts. According to Plaintiff, these clients told him that Defendant Race had encouraged them to keep their accounts with Simon Financial. (Id. at ¶¶ 47, 50.)

According to Defendants, the September 18, 2002 Contract between Defendant Race and Plaintiff was "simply a new pay structure for the accounts itemized." (Doc. No. 2 at ¶ 104.) Defendants allege that Plaintiff was permitted to take the sixteen accounts only so long as he fulfilled his other requirements under his Employment Contract with Simon Financial. (Id. at

---

[2] The Contract lists nine "Individual Clients" and seven "401k Clients," for a total of sixteen accounts. Neither party elaborates on the nature of the "Individual Client" accounts or how they differ from the 401(k) accounts. The parties refer to the sixteen accounts listed as the "401(k) and individual client accounts."

3

¶ 105.) Once Plaintiff's employment with Simon Financial ended, Defendants were no longer obligated to share with Plaintiff any profits from clients who refused to join Plaintiff's new firm. (Id.) Whichever clients chose to join Plaintiff's new firm were required to have their accounts transferred by September 10, 2013, when the employment relationship would end. (Id. at ¶ 111.)

Defendants allege that Plaintiff engaged in wrongdoing that breached his Employment Contract with Simon Financial and rendered the September 18, 2002 Contract for the sixteen 401(k) and individual client accounts void. Defendants do not specify the exact timing of this misconduct. First, Defendants allege that Plaintiff used the Central Registration Depository ("CRD") number of Simon Financial without authorization and misrepresented himself as the administrator of certain Simon Financial accounts. (Id. at ¶ 115-116.) He also failed to comply with regulatory procedures, policies, and laws (Id. at ¶ 95); used client traffic software and client tracking software without authorization (Id. at ¶¶ 97-99); used unauthorized technology to store data provided by Simon Financial (Id. at ¶ 101); corresponded with clients without authorization (Id. at ¶ 100); disclosed information pertaining to securities solicitations without authorization (Id. at ¶ 102); and, finally, disseminated and took proprietary information after his employment with Simon Financial ended. (Id. at ¶ 103.)

As noted above, Plaintiff has filed a Motion to Dismiss the counterclaims against him for breach of contract and fraud.[3] (Doc. No. 4.) For reasons that follow, the Court will dismiss Defendants' counterclaim for fraud. Defendants' counterclaim for breach of contract will proceed.

---

[3] Defendants also assert a counterclaim for conversion of intangible property (Count III). This conversion refers to Plaintiff's unauthorized use of Simon Financial's CRD number, his misrepresentation as being the administrator of certain Simon Financial accounts, and the unauthorized signature of his name and CRD number on accounts that were not clients of Simon Financial. (Doc. No. 2 at ¶¶ 120-29.) Plaintiff has not moved to dismiss this counterclaim so the Court will not discuss it further.

4

### III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. ANALYSIS

### A. Defendants Have Sufficiently Alleged a Counterclaim for Breach of Contract

Defendants allege that Plaintiff breached his Employment Contract with Simon Financial by engaging in wrongdoing.[4] Plaintiff argues that Defendants' counterclaim for breach of contract lacks specificity.

A party asserting a breach of contract claim under Pennsylvania law must establish three elements: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resultant damages. Chemtech Int'l. Inc. v. Chemical Injection Techs., Inc., 247 Fed. Appx. 403, 405 (3d Cir. 2007). Here, Defendants' counterclaim is based on the Employment Contract between Plaintiff and Simon Financial. Defendants allege that the executed Employment Contract "went missing and is now unavailable," but attach a form employment contract to their Response to the Motion to Dismiss. (Doc. No. 7 at 3; Ex. B.) Plaintiff does not contest the existence of the Employment Contract.

Pursuant to the form employment contract, Plaintiff agreed to the following:

---

[4] Defendants' counterclaim for breach of contract is based on Plaintiff's alleged breach of his Employment Contract with Simon Financial, rather than the breach of his September 18, 2002 Contract with Defendant Race for the sixteen 401(k) and individual client accounts. (Doc. No. 7 at 5-6.)

6

> Licensee [Plaintiff] does further agree to conduct business as such, and to comply with all rules and regulations of the SEC, PSC, NYSE, all applicable Departments of Insurance, the various states, and any other applicable jurisdiction or self-regulatory organizations in or through which TSG [The Simon Financial Group] or Licensee is registered or licensed, expressly including all states where Licensee is registered as an investment advisor.

***

> Licensee further agrees to comply with, and abide by, all of the polices and rules included in the policy and procedures manuals of TSG, as the same presently exist, and as may be from time to time amended.

***

> Licensee will not mail any correspondence, or cause any advertising pertaining to securities solicitation, or securities business, without first securing the approval of TSG; and will further provide copies of any such correspondence or advertising to TSG.

***

> The Licensee will during the continuance of this Agreement and thereafter, neither directly or indirectly disseminate or make use of any of the confidential business and technical information of TSG, and its clients, in any manner contrary to the best interests of TSG, and its clients, without limitation as to time or how much information may have been acquired. Such confidential information is considered to include, without limitation, sales and distribution information, price lists, the identity and lists of actual and potential customers and clients, and technical information; all to the extent that such information is not intended for dissemination in the trade.

***

> If for any reason, there is a separation of service between Licensee and TSG, Licensee may have no financial advisory relationship with any type of assigned client above which have been defined for no less than 3 years. If for any reason Licensee continues their relationship, solicits, contacts or in any form has a professional relationship with these assigned clients, Licensee will be in violation of their contract with TSG and required to pay TSG fees, penalties, court cost, loss of revenue etc. as determined through

> arbitration in accordance with the arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(Doc. No. 7, Ex. B. at ¶¶ 7, 8, 8(h), 11, 15.)

Construing the facts in the light most favorable to Defendants for purposes of Plaintiff's Motion to Dismiss the breach of contract claim, Defendants have sufficiently pled that Plaintiff engaged in misconduct that breached his duties under the Employment Contract. Defendants allege that Plaintiff used the CRD number for Simon Financial without authorization, used client traffic software without authorization, transferred client information to an outside source, disclosed client information to advertising companies, and took propriety information after he was terminated from Simon Financial. This conduct would amount to a breach of the terms of the Employment Contract delineated above.

Under the Employment Contract, Plaintiff agreed to comply with all applicable rules and regulations, as well as the policies of Simon Financial. He agreed not to disseminate or make use of any confidential business or technical information of Simon Financial, and not to engage in advertising or solicitation without approval. While Defendants do not specify the exact nature of the damages caused by the breach, they do state that they have suffered damages. (Doc. No. 2 at ¶ 108.) Therefore, at this stage of the proceedings, these allegations sufficiently establish the existence of a contract, the breach of a duty imposed by the contract, and resultant damages, and the Court will not dismiss the counterclaim against Plaintiff for breach of contract.

## B. Defendants' Counterclaim for Fraud Will Be Dismissed Under the Gist of the Action Doctrine

Defendants also filed a counterclaim against Plaintiff for fraud. Plaintiff contends that this claim should be dismissed for two reasons. First, Plaintiff argues that the gist of the action

doctrine bars the fraud claim since it arises solely from a contract between the parties and is duplicative of the breach of contract counterclaim. Second, Plaintiff claims that Defendants lack standing to assert a fraud claim because the alleged fraudulent misrepresentations were made to third-parties who are not involved in this lawsuit.

Under Pennsylvania law, a cause of action for fraud includes the following elements: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. Bohm v. Commerce Union Bank of Tennessee, 794 F.Supp. 158, 163 (W.D. Pa. 1992). However, the gist of the action doctrine may apply to preclude a fraud claim where the essence of the claim actually lies in a contract that governs the parties' relationship. Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 718 (Pa. Super. Ct. 2005). While the Pennsylvania Supreme Court has not expressly adopted this doctrine, the Superior Court of Pennsylvania has repeatedly held that the gist of the action doctrine forecloses tort claims: "1) arising solely from a contract between the parties; 2) where the duties allegedly breached were created and grounded in the contract itself; 3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (internal quotations omitted); Indalex, Inc. v. Nat'l Union Fire Insur. Co., 83 A.3d 418, 425 (Pa. Super. Ct. 2013) (quotation omitted). This doctrine operates to preclude a plaintiff from re-characterizing a standard breach of contract claim as a tort action. Indalex, 83 A.3d at 425 (quoting Autochoice Unlimited, Inc. v. Avangard Auto Finance, Inc., 9 A.3d 1207, 1212 (Pa. Super. Ct. 2010) (quotation omitted)).

In determining whether Plaintiff's fraud claim is barred by the gist of the action doctrine, "the central analysis is whether the [fraud] claim is based on contractual duties, or conversely, whether the contract is collateral to a tort claim that is based on duties imposed by 'larger social policies embodied in the law of torts.'" Mirizio v. Joseph, 4 A.3d 1073, 1084 (Pa. Super. Ct. 2010) (quoting Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 105 (3d Cir. 2001)). "The 'gist of the action' doctrine cannot be captured by any precisely worded test. Rather, the doctrine appears to call for a fact-intensive judgment as to the nature of a claim." Williams v. Hilton Group PLC, 93 Fed. Appx. 384, 386 (3d Cir. 2004).

To support their counterclaim for fraud, Defendants again state that Plaintiff used the CRD number for Simon Financial without authorization and misrepresented himself as the administrator of certain Simon Financial accounts. (Doc. No. 2 at ¶¶ 115-16.) Defendants argue that these actions resulted in Plaintiff's breach of a larger social policy and an "ethical duty to [Plaintiff's] employer," which creates an action in tort rather than in breach of contract. (Doc. No. 13 at 7.)

While the allegations may implicate social policies as defined by Defendants, they are specifically grounded in the Employment Contract between Plaintiff and Simon Financial. Under the Employment Contract, Plaintiff was required to comply with all procedures and policies of the firm. (Doc. No. 4, Ex. B at ¶ 104). According to the allegations under the breach of contract counterclaim, Plaintiff's unauthorized use of Simon Financial's CRD number and his various other misrepresentations resulted in the breach of his Employment Contract. (Doc. No. 2 at 97-108.) Therefore, these allegations are based on the contractual duties in the Employment Contract, rather than being collateral to a tort claim.

In eToll, Inc. v. Elias/Savion Adver., Inc., the Superior Court of Pennsylvania found that the "fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action." 811 A.2d at 21. Instead, the fraud claims were so "inextricably intertwined with the contract claims" that they were barred as a matter of law from being raised independently. Id. Similarly, Defendants do not allege that Plaintiff fraudulently induced them to enter into the Employment Contract or that the contract is collateral to a tort claim. Rather, the fraud at issue is so intertwined with Plaintiff's alleged breach of the Employment Contract that allowing a counterclaim for fraud would essentially duplicate the counterclaim for breach of contract. Because the "gist" of the counterclaim for fraud sounds in contract rather than tort, Defendants' counterclaim for fraud will be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' counterclaim for fraud will be dismissed. Defendants' counterclaim for breach of contract will not be dismissed. An appropriate Order follows.